Argued and submitted September 2, 1997, reversed and remanded for further proceedings January 21, petition for review allowed August 11, 1998 (327 Or 484)

Steven R. WELKER,
by and through Leslie R. Bradbury, assignee,
*Appellant,*

*v.*

TEACHER STANDARDS AND
PRACTICES COMMISSION,
*Respondent.*

(95C-12525; CA A93668)

953 P2d 403

Argued and submitted September 2, 1997.

James M. Brown argued the cause for appellant. With him on the briefs were Nicole M. Hendricks and Enfield Brown Collins & Knivila.

Michael C. Livingston, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

Before De Muniz, Presiding Judge, Deits, Chief Judge, and Haselton, Judge.

HASELTON, J.

Deits, C. J., dissenting.

## HASELTON, J.

Plaintiff appeals, assigning error to the trial court's entry of summary judgment against his claim for indemnity. Plaintiff contends that the trial court erred in holding that plaintiff's statutory indemnity action was barred by disclaimer and "hold harmless" provisions in the contract between Welker, plaintiff's assignor, and defendant. We conclude that there are disputed issues of material fact bearing on whether enforcement of those provisions would impermissibly conflict with fundamental public policies embodied in the Oregon Tort Claims Act (OTCA). Accordingly, we reverse and remand.

The material undisputed facts are as follows: The Teacher Standards and Practices Commission (TSPC) has licensing and disciplinary authority over Oregon school administrators. *See* ORS 342.121; ORS 342.175. In August 1991, TSPC's Executive Secretary David Myton received a complaint alleging sexual misconduct against the superintendent of The Dalles public schools, Leslie Bradbury. Pursuant to ORS 342.176,[1] TSPC appointed a private citizen, Steven Welker, to investigate the complaint.

Before Welker began his investigation, he and TSPC executed a "Personal Service Contract." The contract specified, in pertinent part:

"11. *Access to Records*
The Commission, the Secretary of State's Office of the State of Oregon, the Federal Government and their duly authorized representatives shall have access to the books, documents, papers, and records of the Contractor which are directly pertinent to the specific Contract for the purpose of making audit, examination, excerpts, and transcripts. The Contractor shall not disclose all or any part of such records

---

[1] ORS 342.176 provides, in part:

"(1) Upon receipt of a complaint or information that a person has violated ORS 342.143 or 342.175, the Teacher Standards and Practices Commission shall promptly undertake an investigation.

"(2) The commission may appoint an investigator and shall furnish the investigator with appropriate professional and other special assistance reasonably required to conduct the investigation[.]"

to any other person, firm, corporation, association, or any other entity.

"* * * * *

"13. *State Tort Claims Act*
Contractor is not an officer, employe, or agent of the State as those terms are used in ORS 30.265.

"* * * * *

"16. *Indemnity*
The Contractor shall def[end], save, and hold harmless the State of Oregon and the Commission, its officers, agents, employes, and members from all claims, suits, or actions of whatsoever nature resulting from or arising out of the activities of the Contractor or its subcontractors, agents, or employes under this agreement.

"* * * * *

"24. *Severability*
The parties agree that if any term or provision of this contract is declared by a court of competent jurisdiction to be illegal or in conflict with any law, the validity of the remaining terms and provisions shall not be affected, and the rights an[d] obligations of the parties shall be construed and enforced as if the Contract did not contain the particular term or provision held to be invalid."

Welker conducted an investigation of the allegations against Bradbury and ultimately prepared a report of that investigation, which he delivered to the TSPC. Subsequently, and in executive session, the TSPC decided not to pursue the charges against Bradbury and closed the file. Thereafter, and in contravention of both ORS 342.176(4)[2] and paragraph 11 of his personal services contract with TSPC, *see* 152 Or App at 192-93, Welker released a copy of the report to the complainant. The complainant circulated the report to The Dalles school board.

---

[2] ORS 342.176(4) (since amended by Or Laws 1997, ch 165, § 2, ch 594 § 2) provides:

"The documents and materials used in the investigation and the report of the executive secretary are confidential and not subject to public inspection unless the commission makes a final determination that the person charged has violated ORS 342.143 or 342.175."

Bradbury filed suit against Welker for wrongful release of the report, and Welker confessed judgment in the amount of $200,000.[3] Welker assigned his rights, including any right to indemnity by the TSPC, to Bradbury, in exchange for a covenant not to execute. Bradbury, as Welker's assignee, thereafter sent a written request for counsel and indemnification to the Attorney General's office pursuant to ORS 30.287(1).[4] Bradbury received no response to that letter.

In August 1995, Bradbury, as Welker's assignee, filed suit against TSPC for indemnity pursuant to ORS 30.287(3).[5]

Defendant moved for summary judgment on two alternative grounds. First, TSPC asserted that Bradbury, by accepting Welker's claimed "right" to indemnity by assignment, stepped into Welker's shoes and could assert no greater rights than Welker himself. TSPC further asserted that the terms of Welker's contract, and particularly paragraphs 13 and 16, explicitly precluded any indemnity and that, thus, just as Welker could not obtain indemnity from TSPC, neither could Bradbury, his assignee. Second, TSPC argued, Welker's disclosure of the report, in violation of statutory and contractual provisions requiring confidentiality, constituted "malfeasance in office or willful or wanton neglect of duty" that, under ORS 30.287(3), precluded any entitlement to indemnity.

Plaintiff responded, and, concurrently, filed a cross-motion for summary judgment. Plaintiff asserted that, notwithstanding paragraph 13 of Welker's contract with TSPC, Welker was, in fact, an "agent" of TSPC, for purposes of the OTCA, and not an independent contractor. Because Welker

---

[3] Bradbury also filed a separate action against the TSPC. The nature and disposition of that action, as described in *Bradbury v. Teacher Standards and Practices Comm.*, 151 Or App 176, 947 P2d 1145 (1997), are immaterial to our discussion.

[4] ORS 30.287(1) provides, in part:

"If any civil action, suit or proceeding is brought against any officer, employee or agent of a local public body[,] * * * the officer, employee or agent may file a written request for counsel with the governing body of the public body[.]"

[5] The text of ORS 30.287(3) is set out below. 152 Or App at 198.

was actually TSPC's "agent," plaintiff argued, the contract's "hold harmless" provision offended public policy by limiting recovery and indemnity otherwise available under the OTCA.

The trial court, without elaboration, granted defendant's motion for summary judgment and denied plaintiff's cross-motion. On appeal, plaintiff assigns error to the allowance of defendant's motion but does not challenge the denial of his cross-motion.

A party moving for summary judgment must show that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Jones v. General Motors Corp.*, 325 Or 404, 419-20, 939 P2d 608 (1997); *Seeborg v. General Motors Corp.*, 284 Or 695, 699, 588 P2d 1100 (1978). We view the record in the light most favorable to the party opposing the motion—here, plaintiff. *Seeborg*, 284 Or at 699.

■ We begin by emphasizing the nature of plaintiff's claim. Plaintiff's claim is for *indemnity*. It is not a "first-party" tort claim against TSPC based on Welker's actions. By accepting Welker's alleged claim for indemnity by assignment, plaintiff "stands in the shoes of the assignor and acquires no greater interest than the assignor possessed." *Commonwealth Electric Co. v. Fireman's Fund Ins.*, 93 Or App 435, 438, 762 P2d 1041 (1988). Thus, to the extent the Welker/TSPC contract would bar an indemnity claim by Welker, it similarly precludes plaintiff.

■ Paragraph 16 of the contract expressly provides that Welker will hold TSPC harmless from claims resulting from the duties Welker performs. *See* 152 Or App at 193. That provision is unambiguous. Consequently, unless there is some legally sufficient ground that precludes enforcement of that provision, paragraph 16 bars plaintiff's assigned claim for indemnity. *See, e.g., Pacific First Bank v. New Morgan Park Corp.*, 319 Or 342, 347, 876 P2d 761 (1994) (court must enforce an unambiguous contract according to its terms); *Housing Authority of Portland v. Martini*, 141 Or App 1, 4, 917 P2d 53 (1996) (rules of judicial construction do not apply where the contract is unambiguous).

Plaintiff attempts to avoid enforcement of paragraph 16 in either of two ways. First, he argues that the TSPC/Welker contract, including paragraph 16, is a contract of adhesion that "must be construed against the drafter." Second, he reiterates that paragraphs 13 and 16, singly and in combination, are unenforceable as offending public policies embodied in the OTCA.

■  Whatever the merits of plaintiff's assertion that the TSPC/Welker agreement is a "contract of adhesion," his argument misses a critical, indeed dispositive, point: The principle that an "adhesive" provision is to be construed against the drafter applies only if the provision is ambiguous. Where "adhesive" language is unambiguous, and, thus, does not permit resort to rules of construction, it must be enforced as written. *See Jacob v. Blue Cross and Blue Shield of Oregon*, 92 Or App 259, 263, 758 P2d 382 (1988). Here, paragraph 16 is unambiguous.

Plaintiff's "void as against public policy" arguments are somewhat obscure. However, from the briefs and argument, we understand plaintiff to be advancing two distinct propositions. First, paragraphs 13 and 16 conflict with the remedial purposes of the OTCA, because they impermissibly restrict the ability of injured third parties to collect against the state or public body for its agents' wrongs. In particular, those provisions preclude an injured citizen who secures a judgment against a public agent from obtaining recovery from the employer public body via assignment and subrogation of the agent's rights of indemnity under ORS 30.285(1). Second, paragraphs 13 and 16 impermissibly conflict with the OTCA's policy of indemnifying agents or employees who have been held liable to third parties for torts committed while acting within the scope of their employment. *See* ORS 30.285(1); ORS 30.287(3).

■■  We do not address the first public policy argument because we conclude that the second requires reversal and remand. In particular, we conclude that if Welker *in fact* satisfied the prerequisites of indemnity under ORS 30.287, enforcement of paragraphs 13 and 16 to preclude that statutory entitlement would offend fundamental policies embodied in the OTCA. Because there are disputed issues of fact as

to whether Welker was, in fact, TSPC's "agent" within the meaning of the OTCA, whether his release of the report was within course and scope of his employment, and whether that release constituted "malfeasance in office or willful or wanton neglect of duty," ORS 30.287(3), summary judgment was erroneous.[6]

In *Turney v. J. H. Tillman Co.*, 112 Or 122, 132, 228 P 933 (1924), the court stated the controlling principle:

"[A] person may waive by agreement the benefit of a statutory provision. But there is an exception to this general rule in the case of a statutory provision whose waiver would violate public policy expressed therein, or where rights of third parties which the statute was intended to protect are involved."

We have held that "[w]here legislation is intended to secure general objectives of public policy as well as to protect the interests of individuals, it may not be circumvented by private agreement." *McKinney v. Employment Division*, 21 Or App 730, 737, 537 P2d 126 (1975). *See, e.g., School Dist. No. 1 v. Teachers' Retirement Fund*, 163 Or 103, 110, 95 P2d 720 (1939) (contractual waiver of statutory entitlement to disability benefits held invalid; waiver was "inimical to the public policy of the state" as expressed in the statute); *Young v. Mobil Oil Corp.*, 85 Or App 64, 72-73, 735 P2d 654 (1987) (indemnity provision in foreign contract held invalid because indemnity would subvert public policy as expressed in the exclusive liability provision of the Workers' Compensation Law).[7] A court will not invalidate a contract provision

---

[6] Our decision not to address the merits of plaintiff's first public policy argument rests, in part, on the fact that, even assuming the *legal* premises of plaintiff's first argument, the ultimate success of that argument would depend on the same *factual* predicates that underlie his second argument—*i.e.*, that (a) Welker was TSPC's "agent" for purposes of the OTCA; (b) Welker's conduct "occur[red] in the performance of duty"; and (c) Welker's release of the investigative report did not constitute "malfeasance in office or wilful or wanton neglect of duty." ORS 30.285(1), (2); ORS 30.287(3). Thus, if on remand plaintiff is able to prove those essential facts, he will prevail on his second public policy argument, rendering his first argument superfluous. Conversely, if, in litigating his second public policy argument on remand, plaintiff is unable to prove those factual predicates, his first argument would, necessarily, also fail, regardless of its legal merits.

[7] *Cf. Harmon v. Mt. Hood Meadows, Ltd.*, 146 Or App 215, 222, 932 P2d 92 (1997) (the determination of whether a contract provision violates a "general, uncodified public policy" must be made on an "as applied" basis).

because it undermines public policy unless that public policy is "over-powering." *Eldridge et al. v. Johnston*, 195 Or 379, 405, 245 P2d 239 (1952).

The statutes particularly pertinent to plaintiff's second public policy argument are ORS 30.285(1) and ORS 30.287(3). Those statutes read, respectively, as follows:

> "The governing body of any public body shall defend, save harmless and indemnify any of its officers, employees and agents, whether elective or appointive, against any tort claim or demand, whether groundless or otherwise, arising out of an alleged act or omission occurring in the performance of duty.

> "If the governing body rejects defense of a claim under subsection (1) of this section, no public funds shall be paid in settlement of the claim or in payment of any judgment against such officer, employee or agent. Such action by the governing body shall not prejudice the right of the officer, employee or agent to assert and establish in an appropriate proceedings [*sic*] that the claim or demand in fact arose out of an alleged act or omission occurring in the performance of duty, or that the act or omission complained of did not amount to malfeasance in office or willful or wanton neglect of duty, in which case the officer, employee or agent shall be indemnified by the public body against liability and reasonable costs of defending the claim."

Those OTCA indemnity provisions insulate employees and nonemployee "agents" of public bodies from personal financial responsibility for injuries resulting from conduct within the course and scope of their duties. In so doing, the indemnity statutes embody and effectuate two fundamental public policies. First, they encourage qualified persons to accept public employment. Second, they encourage the zealous execution of public functions, duties, and responsibilities. In *Stevenson v. State of Oregon*, 290 Or 3, 619 P2d 247 (1980), the court described those two related, yet distinct, policies:

> "In 1975, the legislature amended the Tort Claims Act to require that public bodies defend and indemnify their employes against all tort claims arising out of the performance of their duties, except for claims involving 'malfeasance in office or willful or wanton neglect of duty.' The

effect of this amendment is to eliminate the ground for concern by public employes that they can be held liable for a good faith failure to use reasonable care.

"The California Supreme Court has pointed out that a comparable statutory indemnification scheme in that state substantially eliminates the concerns that support the doctrine of public employes' immunity:

> " '* * * The public employee need not suffer concern over the possiblity that he will be compelled to finance and oversee a tort suit filed against him personally; the statute provides for defense by the public entity upon notice, and the employee's best interests clearly favor the giving of such notice. Moreover, the public employee faces only a slim danger of ultimate personal liability; such liability attaches only to the rare instances of injuries arising from acts either outside of the scope of employment or performed with actual fraud, corruption, or malice. Indeed, a principal purpose of the indemnification scheme * * *, limiting the personal threat of suit or liability, centered on assuring the zealous execution of official duties by public employees. To the extent that the ardor of public employees might be affected by the threat of personal liability, these fears will be allayed by the indemnification provisions.' *Johnson v. State*, 69 Cal2d 782, 73 Cal Rptr 240, 447 P2d 352, 359 (1968) (Footnotes omitted.)

"The [Oregon] legislature has thus eliminated the reasons for concern that the prospect of personal liability might dampen the ardor of public employes in the performance of their duties or discourage able persons from accepting responsible employment in the public sector." 290 Or at 12-13 (footnote omitted).

*See also Gill v. SAIF*, 314 Or 719, 724-25, 842 P2d 402 (1992) ("The legislature enacted [ORS 30.285(1)] to eliminate the concern of public employees that they could be held personally liable for a failure to use reasonable care in performing their jobs and thereby to encourage able persons to accept responsible employment in the public sector.").[8]

---

[8] *Cf. Samuel v. Frohnmayer*, 82 Or App 375, 380, 728 P2d 97, *mod* 84 Or App 80 (1986), *rev den* 303 Or 261 (1987) (OTCA indemnity provisions extended to volunteer member of peer review committee established by state workers' compensation department):

■ TSPC suggests, nevertheless, that the statutory protections in ORS 30.285 and 30.287 may be contractually waived. We disagree. As noted, there are "some rights which the law does not permit an individual to barter away." *School Dist. No. 1*, 163 Or at 109. *See id.* at 110 (teachers could not waive their statutory entitlement to disability payments); *Young*, 85 Or App at 72-73 (indemnity provision void as against the public policy embodied in the exclusive liability provision of the Workers' Compensation Law). Because of the fundamental role of indemnity under the OTCA, the rights conferred under ORS 30.285 and ORS 30.287 cannot be abrogated by contract.

Our conclusion in that regard applies equally to public employees and to other persons who are "agents" within the meaning of the OTCA. In *Moxness v. City of Newport*, 89 Or App 265, 268, 724 P2d 1014, *rev den* 306 Or 79 (1988), which involved a claim for indemnity under the OTCA, we described a two-part test for "agency": (1) The "agent" must be performing a function "on behalf of" a public body—*i.e.*, a function that the public body itself is authorized to undertake; and (2) the public body must retain a "right of control" over the agent. *See also Bridge v. Carver*, 148 Or App 503, 509-10, 941 P2d 1039, *rev den* 326 Or 57 (1997) (applying *Moxness* formulation to conclude that defendant doctor was an "agent" within meaning of OTCA). *Cf. Giese v. Bay Area Health District*, 101 Or App 410, 415, 790 P2d 1198, *rev den* 310 Or 281 (1990) (person with "apparent authority" is not an "agent" for OTCA purposes; discussing *Moxness* and *Samuel v. Frohnmayer*, 82 Or App 375, 728 P2d 97, *mod* 84 Or App 80 (1986), *rev den* 303 Or 261 (1987)). Thus, like a public employee, a nonemployee "agent" performs functions that the public entity itself would otherwise perform. In that respect, an employee and a nonemployee "agent" are identical.

■ Because of that identity of function, the second public policy underlying the OTCA's indemnity provisions applies

"The state receives an invaluable service from persons who are willing to volunteer their time and energy to the community. Public policy dictates that they be encouraged, rather than discouraged, to volunteer by holding them harmless from personal liability arising out of services performed on behalf of the state."

equally to employees and to nonemployee "agents." Because both are performing public functions, it is equally imperative that both be encouraged and protected in the zealous performance of their duties—that is, that their "ardor" not be "dampen[ed]" by the prospect of personal liability. *Stephenson*, 290 Or at 13. Just as a waiver of indemnity rights by public employees might cause them to "pull their punches" to the detriment of the greater public good, the same is true of nonemployee "agents" in their performance of public function.

The circumstances of this case, at least when viewed most favorably to plaintiff, exemplify those concerns. TSPC hired Welker to perform an investigation on a sensitive matter, *viz.*, a complaint that a school superintendent had engaged in conduct evincing "gross unfitness" for his position. ORS 342.175(1)(c). The statutory scheme explicitly directs TSPC to undertake such investigations, ORS 342.176(1) (TSPC "shall promptly undertake an investigation"), and further provides that "[t]he commission may appoint an investigator and shall furnish the investigator with appropriate professional and other special assistance reasonably required to conduct the investigation," ORS 342.176(2). The statute also expressly "empower[s]" the investigator to "subpoena witnesses over the signature of [TSPC's] executive secretary" and to swear and compel the attendance of such witnesses. *Id.* Although the analogy is inexact, the investigator performs a function similar to a combination of an investigating police officer and a prosecutor presenting a case to a grand jury.

Thus, the investigator is performing a sensitive function, requiring the exercise of judgment, that is central to the agency's statutory mandate. This is not a case, as the dissent would have it, of "a contractor * * * hire[d] to pave a courthouse parking lot." 152 Or App at 206. It is, rather, a case where it is imperative that the agent act zealously, without fear or favor. In that regard, it makes no difference whether the OTCA "agent" worked exclusively for the public entity, or only occasionally, or even rarely. The public policy of promoting zealous performance is the same; the difference is, at most, one of magnitude and not of kind.

That does not, however, end our inquiry. Enforcement of paragraphs 13 and 16 to preclude plaintiff's indemnity claim would offend public policy only if Welker would otherwise have been entitled to statutory indemnity—that is, if Welker actually satisfied the conditions for indemnity specified in the OTCA. *Accord Harmon*, 146 Or App at 221-24 (enforcement of a contractual exculpatory provision did not, in the particular circumstances presented, offend uncodified public policy). Because there are, at least, disputed issues of material fact as to whether Welker did, in fact, meet those conditions, the question of enforceability of paragraphs 13 and 16 to bar plaintiff's indemnity claim was not susceptible to summary judgment.

Plaintiff asserts, and TSPC does not dispute, that there are unresolved issues of fact as to whether Welker was TSPC's "agent" within the meaning of ORS 30.285 and ORS 30.287. *See Bridge v. Carver,* above; *Moxness v. City of Newport,* above. Nor does TSPC dispute, at least in this context,[9] that Welker's conduct "occur[red] in the performance of duty," ORS 30.285(1); ORS 30.287(3).

TSPC does argue, however, that even assuming that Welker was an "agent" acting within the performance of his duty, the uncontroverted facts demonstrate that Welker's release of the investigative report constituted "malfeasance in office or willful or wanton neglect of duty," ORS 30.285(2), precluding indemnity. We disagree. Plaintiff's complaint alleges that Welker acted negligently in releasing the report. In moving for summary judgment, TSPC did not submit evidence showing that the release was, in fact, "willful or wanton," rather than merely negligent. TSPC similarly failed to make an uncontroverted showing of "malfeasance." Although the OTCA does not define "malfeasance," that term necessarily involves greater culpability than negligence.[10] If it were otherwise, and mere negligence constituted malfeasance, the

---

[9] *Compare Bradbury,* 152 Or App at 194 n 3.

[10] In another context, our Supreme Court has cited, with apparent approval, a definition of "malfeasance" from another jurisdiction, that indicates that "malfeasance" involves much more than mere negligence. *See State v. Langley,* 214 Or 445, 464-66, 315 P2d 560, *cert den* 358 US 826 (1958) (defining malfeasance as "evil doing, the doing of an act which is wholly wrongful and unlawful," and indicating that, as the cases it cited found, "malfeasance may require a corrupt motive").

exceptions to the OTCA indemnity provisions would swallow the whole: Employees who acted negligently, but within the scope of their duties, would not be indemnified.

We thus conclude that, depending on the resolution of disputed factual issues, the enforcement of paragraphs 13 and 16 to preclude plaintiff's indemnity claim may offend public policy. Accordingly, the trial court erred in granting TSPC's motion for summary judgment.

Reversed and remanded for further proceedings consistent with this opinion.

**DEITS, C. J.,** dissenting.

The majority concludes that a private contractor's agreement to hold harmless and indemnify the state agency with which he contracted is contrary to the indemnity provisions of the Oregon Tort Claims Act (OTCA) and offends public policy to such a degree that the court may invalidate or refuse to enforce the agreement. I do not agree with that conclusion, and I therefore dissent.

There is no difference between the majority's and my understanding of what the relevant principles of law are. My disagreement is with the way that the majority applies those principles here. The majority correctly notes that, as a rule, "a person may waive by agreement the benefit of a statutory provision" unless, *inter alia,* the waiver "would violate public policy expressed" in the statute. 152 Or App at 197, *quoting Turney v. J.H. Tillman Co.,* 112 Or 122, 132, 228 P 933 (1924). Further, as the majority also acknowledges, a court may not invalidate or refuse to enforce contractual provisions on public policy grounds unless the policy in question rises to the level that the Supreme Court has described as "over-powering." *Eldridge et al v. Johnston,* 195 Or 379, 405, 245 P2d 239 (1952).

The majority offers three examples of the exceptional circumstances in which the Supreme Court or this court has invoked the public policy rationale as a basis for concluding that agreements that waive or affect entitlement to statutory rights or benefits are unenforceable: *School Dist. No. 1 v. Teachers' Retirement Fund,* 163 Or 103, 95 P2d 720 (1939) (disability benefits); *Young v. Mobil Oil Corp.,* 85 Or

App 64, 735 P2d 654 (1987) (exclusive liability provisions of the Workers' Compensation Law); and *McKinney v. Employment Division*, 21 Or App 730, 537 P2d 126 (1975) (unemployment benefits and the statutory bases for denying them). The majority also cites *McKinney* for the overriding proposition that, "[w]here legislation is intended to secure general objectives of public policy as well as to protect the interests of individuals, it may not be circumvented by private agreement." *Id.* at 737.

The message that emerges from the foregoing principles and authorities is that the invocation of "public policy" as a rationale for judicial nullification of consensual agreements is an exercise in which the courts should rarely indulge. That general proposition applies with particular force when the source of the public policy is statutory. The legislature itself may, and in many instances does, specify which policies that it has promulgated or codified are of a magnitude that they cannot be modified contractually or foregone. *See, e.g.*, ORS 657.855 (providing that "[n]o agreement by an individual to waive the individual's rights under [the unemployment compensation statutes] is valid"). *See also Sun Veneer v. Employment Div.*, 105 Or App 198, 205, 804 P2d 1174 (1991). This is not to say that the courts are foreclosed categorically from invalidating or denying enforcement to contractual provisions on the ground that they offend public policies that are statutory in origin. In my view, however, the courts should be even more reluctant to employ the public policy rationale in that connection than in others, because the legislative branch is the author of the policy and has the capacity to specify what means it regards as necessary for the policy's implementation.

At the expense of being repetitive, the courts should recognize and have recognized that, beyond those general limits, there are certain additional restraints upon their authority to implement statutory policy by nonenforcement of contracts when, as here, the statute is one that confers a right or a benefit upon a particular category of persons. The general rule, as reflected in *Turney*, is that the party is free to waive the benefit that the legislature has given.[1] The

---

[1] Also worthy of note is the court's observation in *Turney*:

instances where the courts may properly depart from that rule, when the legislature itself has expressed no intention to do so, are reflected in *McKinney*: The statutory policy must be of such a nature that significant interests of the public, as well as those of the individuals who are directly benefitted, are implicated.

However, as the cases that both the majority and I find apposite presuppose, *most* statutorily created or statutorily recognized individual rights and benefits are *not* of a kind that are impervious to individual waiver or appropriate subjects for judicial prevention of an individual's agreement to waive them. The line between those statutory benefits that may be waived and those that may not is not precise. It is clear, however, that the invalidation of a contract on the ground that it contravenes a statutory policy is an extraordinary judicial act and that many more contracts and statutes fall on one side of the line than the other.

In this case, the majority traces its conclusion that public policy precludes the enforcement of Welker's contractual waiver of his OTCA indemnity rights to two Supreme Court cases that speak generally about the purpose of those provisions as they relate to public *employees* and one case of ours that uses the term "public policy" in the course of holding that citizen volunteers can be "agents" within the meaning of the provisions. *Stevenson v. State of Oregon*, 290 Or 3, 619 P2d 247 (1980); *Gill v. SAIF*, 314 Or 719, 842 P2d 402 (1992); *Samuel v. Frohnmayer*, 82 Or App 375, 728 P2d 97, *mod* 84 Or App 80 (1986), *rev den* 303 Or 261 (1987). None of those cases was concerned directly with any question about a waiver of statutory benefits or with any questions about contractual enforceability and public policy. Assuming solely for argument's sake that the rationale reflected by the language

---

"By reason of the fact that the habits, opinions, and wants of the people vary with the times so public policy may change with them. So because these habits, opinions and wants are different in different places, what may be against public policy in one state or country may not be so in another[.]" 112 Or at 132.

That is another reason why the definition and implementation of public policy are matters better left to legislatures than courts.

in those opinions on which the majority relies might nevertheless support the conclusion that a waiver of indemnity rights by public *employees*, or even by *some* agents,[2] might be unenforceable under a judicially declared public policy, that rationale cannot extend as far as the majority would stretch it, and it does not extend to the circumstances of this case.

The court said in *Gill*:

"The legislature enacted [the OTCA indemnity provisions] to eliminate the concern of public employees that they could be held personally liable for a failure to use reasonable care in performing their jobs and thereby to encourage able persons to accept responsible employment in the public sector." 314 Or at 724-25.

The court made the same points at greater length in *Stevenson*, where it also summarized the purposes of the indemnity provisions as being to lessen the possibility that fears of "personal liability might dampen the ardor of public employe[e]s in the performance of their duties or discourage able persons from accepting responsible [public] employment." 290 Or at 13.

The relevant language in *Stevenson* and *Gill* relates to the procurement and retention of an able and responsible corps of public servants. Welker is not a public servant. He is an independent contractor, and one whose services are by no means uniquely governmental in character. He is simply a private individual who plies a trade and, on different occasions, might sell his services to a public body as readily as to a private one. There is no functional difference for purposes of the issue in this case between him and a private contractor whom the government hires to pave a courthouse parking lot and whose previous or next job was or will be to perform the same service for a department store.

The majority does not distinguish between public employees and agents of governmental bodies for purposes of its holding that a waiver of OTCA indemnity rights is contrary to public policy. Indeed, the majority makes *no* distinctions at all. Under its reasoning, *no* agent of a public body

---

[2] I also assume, again only for purposes of discussion, that Welker is or might be an "agent" within the meaning of the OTCA provisions.

may contractually waive the statutory benefit; the majority implicitly but clearly reaches that conclusion as to all public employees and agents and, according to its analysis, there is no difference for purposes of the issue it treats as decisive between a full-time police officer, a citizen volunteer of the kind involved in *Samuel*, and a foreign corporation that the governmental body hires on a one-time basis to provide a particular service that the corporation simultaneously or sequentially provides to numerous public and private entities throughout the country.

The majority attempts to bridge the gap between public employees and independent contractors of the kind in question through a two-stage construct. First, the majority hammers home the truism that agents of a governmental body, like its regular employees, are performing governmental or public functions while they are engaged as contractors for the public body. Second, the majority continues:

"In that respect, an employee and a non-employee 'agent' are identical.

"Because of that identity of function, the second public policy underlying the OTCA's indemnity provisions applies equally to employees and to nonemployee 'agents.' Because both are performing public functions, it is equally imperative that both be encouraged and protected in the zealous performance of their duties—that is, that their 'ardor' not be 'dampened' by the prospect of personal liability." 152 Or App at 200-01.

The problem with the majority's analysis is that its bridge crosses only half the gap. *Stevenson* and *Gill* speak in terms about only regular and ongoing public employees, and they repeatedly describe the salutary purpose that they identify in the OTCA indemnity provisions as being directed toward the alleviation of the liability concerns that might prevent able persons from becoming or ably serving as public employees.

It is obviously desirable for independent contractors who provide episodic services for the government to perform those services—as well as those that they perform for anyone else—conscientiously and "zealously." It is equally apparent that the legislature has seen fit to cover agents, as well as

regular public employees, with the indemnity protections of the OTCA. In those and possibly other respects, employees and independent contractors who qualify as governmental "agents" are similar. In other respects that I have touched on above, they are different, and the public interest is qualitatively different in the employment and "zealous" performance of regular public servants, on the one hand, and intermittent or one-time hired contractors, on the other.[3]

If the question here involved the interpretation or application of the indemnity statutes, the similarities between employees and agents that the majority describes would be dispositive. The indemnity provisions of the OTCA expressly *confer* their benefit on agents of all kinds as much as they do on full-time regular governmental employees. However, that is not the issue. Rather, the question is whether, in the absence of any such indication in the statutes themselves, a court may say that a public policy inheres in the indemnity statutes that is of such an "overpowering" kind that *no* independent contractor's agreement to *waive* the statutory benefit can be given effect. I do not agree with the majority's answer.

It is at least noteworthy that the legislature *has* expressly declared that at least one type of waiver provision in contracts between private parties and governmental bodies is unenforceable on public policy grounds. Under ORS 279.063, a contractual provision that "purports to waive, release or extinguish the rights of a contractor" to remedies for unreasonable delay in performance resulting from acts or omissions of the public body "is against public policy and is void and unenforceable." The existence of that nonwaiver

---

[3] At 152 Or App 201-02, the majority provides a description of the public significance that it perceives in the particular service that Welker was hired to perform. That description does not alter the fact that, under the principal aspects of the majority's reasoning, a waiver of the statutory benefit by *any* independent contractor who is an agent for purposes of the statute would violate public policy. Moreover, it would seem to be a given from the standpoint of the courts that a public contract, at least if it is not specifically challenged as lacking one, *is* for a service or purpose that the responsible governmental authorities deem to be important enough to the public to warrant the hiring of the contractor. The majority's intrusion into the legislature's policymaking role is in no way attenuated by the fact that it also designates itself a quality control board for the executive department's contracts.

provision illustrates that the legislature knew how to say it when it meant it and did not say it in connection with waivers of the statutory right in question here.

However, I do not wish to place great emphasis on that point, because it is not my view that the legislature must have manifested its intent *not* to abrogate particular contracts on public policy grounds in order for it to be generally inappropriate for the courts to take it upon themselves to do the opposite. The courts are not in the business of making *statutory* policy. Yet that is exactly what a court does any time that it holds that, for reasons of public policy, a statute should be given a particular effect that the court cannot affirmatively say that the legislature intended.

It is nevertheless clear that the Oregon cases hold that, on occasion, the courts may do that. It is equally clear, under the cases, that the occasions on which the courts may do so are rare and are subject to definable standards. Under those standards, this is not a complicated case. The legislature has given private contractors, to the extent they are agents of public bodies under the OTCA, a right to indemnity for certain work-related torts. The contractual provision at issue requires Welker to give essentially what the statute entitles him to receive and constitutes a waiver of the contractual right. The threshold question in determining whether the courts may refuse to give effect to the provision is whether there is a cognizable public interest, over and above the individual benefit that the statute confers, in an independent contractor's ability to obtain indemnity from the government for liability that the contractor incurs as a result of his performance of a single limited and isolated service that he has contracted to perform for the government. I would conclude that, at least generally and under the circumstances of this case, the answer is no.

Therefore, I respectfully dissent.